# EXHIBIT 1

EXHIBIT 1

DATE FILED: June 12, 2018 10:47 AM
FILING ID: 960FB5701357D
CASE NUMBER: 2018CV30556

| | |
|---|---|
| District Court, Boulder County, Colorado<br>Court Address: 1777 6th Street, Boulder, CO 80302 | |
| **Plaintiff:** DEAN HOUSER, individually and on behalf of all others similarly situated,<br><br>- vs -<br><br>**Defendants:** CENTURYLINK, INC., GLEN F. POST III, R. STEWART EWING, JR., DAVID D. COLE, WILLIAM A. OWENS, MARTHA H. BEJAR, VIRGINIA BOULET, PETER C. BROWN, W. BRUCE HANKS, JEFFREY K. STOREY, STEVEN T. CLONTZ, MARY L. LANDRIEU, GREGORY J. MCCRAY, HARVEY P. PERRY, MICHAEL J. ROBERTS, LAURIE A. SIEGEL, SUNIT S. PATEL, and Does 1-25, inclusive, | ▲ COURT USE ONLY ▲<br><br>Case Number:<br><br>Div.:          Ctrm: |
| Attorney for Plaintiff:<br>Rusty E. Glenn<br>**The Shuman Law Firm**<br>600 17th Street, Ste. 2800 South,<br>Denver, CO 80202<br>Phone Number:   303-861-3003<br>FAX Number:      303-536-7849<br>E-mail:  rusty@shumanlawfirm.com<br>Atty. Reg. #:  39183 | |
| **CLASS ACTION COMPLAINT FOR<br>VIOLATIONS OF THE SECURITIES ACT OF 1933** | |

Plaintiff Dean Houser ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorney, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which include, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by CenturyLink, Inc. ("CenturyLink" or the "Company"), Company press releases, earnings calls, analysis reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who purchased or acquired CenturyLink, Inc. stock pursuant or traceable to the Company's Registration Statement and Prospectus (together, the "Offering Documents") issued in connection with the merger of CenturyLink with Level 3 Communications, Inc. ("Level 3"), and their subsidiaries, pursuant to which CenturyLink acquired Level 3 pursuant to a merger agreement   (the "Merger").  This action asserts claims under the Securities Act of 1933 ("1933 Act") against CenturyLink and certain members of the Company's executive officers, directors, and authorized representatives.

## II.    JURISDICTION AND VENUE

2.      The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77l (a)(2) and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.  This action is not removable under §22 of the 1933 Act, which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." *See Cyan Inc. v. Beaver County Employees Ret. Fund*, 138 S.Ct. 1061, 1065 (2018).

3.      The violations of law complained of herein occurred in substantial part in this County. Defendant CenturyLink conducts operations in this County and several of the individual defendants, including Storey and Patel, reside in this county.

## III.    PARTIES

4.      Plaintiff Dean Houser acquired shares of CenturyLink stock in exchange for Level 3 stock and has been damaged thereby.  Mr. Houser received shares of CenturyLink stock pursuant to the Registration Statement and Prospectus issued in connection with the Merger.

5.      Defendant CenturyLink is an international facilities-based communications company engaged primarily in providing an integrated array of services to residential and

business customers. The Company's communications services include local and long-distance voice, virtual private network ("VPN") data network, private line (including business data services), Ethernet, information technology, wavelength, broadband, colocation and data center services, managed services, professional and other services provided in connection with selling equipment, network security and various other ancillary services.   The Company is headquartered in Monroe Louisiana at 100 CenturyLink Drive, Monroe, LA 71203, and conducts substantial business in the United States, including within this County.

6.       Defendant Glen F. Post III ("Post") was CenturyLink's Chief Executive Officer ("CEO") and President at the time of the Merger.  Post has also been a Director of the Company since 1985.  Post signed the false and misleading Registration Statement and solicited Level 3 shareholders to vote in favor of the Merger and purchase the CenturyLink stock which was registered pursuant to the Registration Statement and Prospectus.

7.       Defendant R. Stewart Ewing, Jr. ("Ewing") was, at the time of the Merger, CenturyLink's Executive Vice President, Chief Financial Officer, and Assistant Secretary. Ewing retired from CenturyLink after the Merger closed, but had worked at the Company for 28 years and during such time was responsible for the Company's financial activities, including the Accounting, Treasury, Supply Chain, Real Estate and Internal Audit functions. As part of the Merger, Ewing received performance-based bonuses and severance payments of over $2.4 million.  Ewing signed the false and misleading Registration Statement.

8.       Defendant David D. Cole ("Cole") served as Executive Vice President and Controller of CenturyLink at the time of the Merger.   In these roles, Cole served as the Company's principal accounting officer.   Cole resigned from these positions effective April 8, 2018, but continues to provide services to the Company in a part-time, non-officer role following that date. Cole signed the Offering Documents.

9.       Defendant William A. Owens ("Owens") served as a director and Chairman of the Board of CenturyLink as of the time the Merger Agreement was signed.  Owens signed the false and misleading Registration Statement.

10.       Defendant Martha H. Bejar ("Bejar") is a director of the Company and was a director at the time of the Merger.  Bejar signed the false and misleading Registration Statement.

11.       Defendant Virginia Boulet ("Boulet") is a director of the Company and was a director at the time of the Merger.  Boulet has been a director of CenturyLink since 1995. Since March 2014, Ms. Boulet has served as Managing Director of Legacy Capital LLC, an investment banking firm based in New Orleans, Louisiana. Previously, she was Special Counsel at Adams and Reese LLP, a law firm, from March 2002 to March 2014. She practiced as a corporate and securities attorney for Phelps Dunbar, L.L.P. from 1992 to 2002 and for Jones Walker L.L.P. from 1983 to 1992. She is currently a director of W&T Offshore, Inc. Ms. Boulet is a member of the Nominating and Corporate Governance (Chair) and Human Resources and Compensation Committees of CenturyLink. Boulet signed the false and misleading Registration Statement.

12. Defendant Peter C. Brown ("Brown") is a director of the Company and was a director at the time of the Merger. Brown has been a director of the Company since July 1, 2009, and is a member of the Audit Committee and Chairman of the Company's Risk Evaluation Committee. Brown signed the false and misleading Registration Statement.

13. Defendant Jeffrey K. Storey ("Storey") is the President, COO, and a director of CenturyLink. He previously served as the President, CEO, and a director of Level 3 Communications and was appointed to serve as a director of CenturyLink effective as of November 1, 2017. The Registration Statement named Storey as a person who was to be appointed to the CenturyLink Board as part of the Merger. Storey is a resident of Boulder.

14. Defendant Steven T. Clontz ("Clontz") is a director of CenturyLink. He was appointed to serve as a director of CenturyLink effective as of November 1, 2017. The Registration Statement named Clontz as a person who was to be appointed to the CenturyLink Board as part of the Merger.

15. Defendant W. Bruce Hanks ("Hanks") is a director of the Company and was a director at the time of the Merger. Hanks has been a director of the Company since 1992. Since May 31, 2017, he has served as non-executive Vice Chairman of the Board of Directors of CenturyLink. He has served as a consultant with Graham, Bordelon, Golson and Gilbert, Inc., an investment management and financial planning company, since December 1, 2005. From March 2001 to June 2004, Mr. Hanks served as Athletic Director of the University of Louisiana at Monroe. From August 1980 to March 2001, he held various executive positions at CenturyLink, including Chief Operating Officer, Senior Vice President -- Corporate Development and Strategy, Chief Financial Officer, Senior Vice President -- Revenues and External Affairs, and President -- Telecommunications Services. Prior to then, Mr. Hanks worked as a certified public accountant with Peat, Marwick & Mitchell for three years. He is currently an advisory director of IberiaBank Corporation. Mr. Hanks also previously served on the executive boards of several telecommunications industry associations and the boards of other publicly-owned companies. Mr. Hanks is a member of the Audit (Chair) and Risk Evaluation Committees. Hanks signed the false and misleading Registration Statement.

16. Defendant Mary L. Landrieu ("Landrieu") is a director of the Company and was a director at the time of the Merger. Landrieu has been a director since November 2015 and is a member of the Company's Nominating and Corporate Governance and Risk Evaluation Committees. Landrieu signed the false and misleading Registration Statement.

17. Defendant Gregory J. McCray ("McCray") served as a director of CenturyLink at the time the Merger Agreement was signed, and had served on the Board since 2005. McCray signed the false and misleading Registration Statement.

18. Defendant Harvey P. Perry ("Perry") is a director of the Company and was a director at the time of the Merger. Perry has been a director since 1990. Since May 31, 2017, he

has served as non-executive Chairman of the Board of Directors of CenturyLink. He retired from CenturyLink in 2003. Mr. Perry joined CenturyLink in 1984, serving as Secretary and General Counsel at CenturyLink for approximately twenty years and as Executive Vice President and Chief Administrative Officer for almost five years. Prior to joining CenturyLink, Mr. Perry worked as an attorney in private practice for 15 years. Mr. Perry is a member of the Risk Evaluation Committee. Defendant Perry signed the false and misleading Registration Statement.

19.     Defendant Michael J. Roberts ("Roberts") is a director of the Company and was a director at the time of the Merger. Perry has been a director since April 1, 2011.  Mr. Roberts is a member of the Human Resources and Compensation Committee and the Nominating and Corporate Governance Committee.   Defendant Roberts signed the false and misleading Registration Statement.

20.     Defendant Laurie A. Siegel ("Siegel") is a director of the Company and was a director at the time of the Merger. Perry has been a director since July 1, 2009.  Ms. Siegel is the Chair of CenturyLink's Human Resources and Compensation Committee.  Siegel signed the false and misleading Registration Statement.

21.     Defendant Sunit S. Patel is the CEO of CenteryLink and, prior to the Merger, was the CFO of Level 3. Patel is a resident of Boulder County, Colorado. Patel helped draft and prepare portions of the Registration Statement and Prospectus and solicited Level 3 shareholders to vote in favor of the Merger and purchase the CenturyLink stock that was registered pursuant to the Registration Statement and Prospectus. Defendant Patel certified financial statements that were included in the Registration Statement and Prospectus, and was listed in the Prospectus as the person who would become CFO of CenturyLink after the Merger.

22.     The defendants referenced above in ¶¶ 6-21 are collectively referred to as the "Individual Defendants."   The Individual Defendants (except for Clontz and Patel) signed the Registration Statement.   Furthermore, as directors and/or executive officers, the Individual Defendants participated in the solicitation and sale of CenturyLink stock to shareholders of Level 3 as consideration in the Merger for their own benefit and the benefit of CenturyLink.

23.     The true nature and capacities of defendants sued herein as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names.  Plaintiff will seek to amend this complaint and include these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by plaintiff and the Class (as defined below).

## IV.    CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action as a class action pursuant to Colorado Rule of Civil Procedure 23 on behalf of a class consisting of all persons or entities who acquired CenturyLink stock pursuant or traceable to the Company's Registration Statement and Prospectus (Registration No. 333-215121) issued in connection with the Merger and who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.    The members of the Class are so numerous that joinder of all members is impracticable.  CenturyLink stock is actively traded on the New York Stock Exchange under the ticker symbol "CTL" and millions of shares were sold in the Merger.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CenturyLink or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

27.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

28.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.  whether defendants violated federal securities laws, including but not limited to the 1933 Act;

      b.  whether statements made by defendants to the investing public in the Offering Documents contained materially false and misleading statements, or misrepresented or omitted material facts about the Merger; and

      c.  the proper measure of damages.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     **SUBSTANTIVE ALLEGATIONS**

30.     CenturyLink  is an integrated communications company engaged primarily in providing an array of communications services, including local and long-distance voice, broadband, Multi-Protocol Label Switching, private line (including special access), Ethernet, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol, information technology and other ancillary services. CenturyLink strives to maintain its customer relationships by, among other things, bundling its service offerings to provide a complete offering of integrated communications services. Based on approximately 11.2 million total access lines at September 30, 2016, CenturyLink is the third largest wireline telecommunications company in the United States. CenturyLink operates 74% of its total access lines in portions of Colorado, Arizona, Washington, Minnesota, Florida, North Carolina, Oregon, Iowa, Utah, New Mexico, Missouri, and Nevada. CenturyLink also provides local service in portions of Idaho, Ohio, Wisconsin, Virginia, Texas, Nebraska, Pennsylvania, Montana, Alabama, Indiana, Arkansas, Wyoming, Tennessee, New Jersey, South Dakota, North Dakota, Kansas, Louisiana, South Carolina, Michigan, Illinois, Georgia, Mississippi, Oklahoma, and California. In the portion of these 37 states where CenturyLink has access lines, CenturyLink is the incumbent local telephone company. At September 30, 2016, CenturyLink served approximately 6.0 million broadband subscribers and approximately 318,000 Prism TV subscribers. CenturyLink's methodology for counting access lines, broadband subscribers and Prism TV subscribers may not be comparable to those of other companies.  CenturyLink conducts substantial operations in Colorado, including in this County.

31.     On October 31, 2016, CenturyLink and Level 3 announced that they had signed an Agreement and Plan of Merger (the "Merger"), pursuant to which CenturyLink would acquire Level 3 in a transaction valued at $34 billion.  Pursuant to the Merger Agreement, each outstanding share of Level 3 common stock, other than shares held by CenturyLink, Level 3 or their respective subsidiaries, would be converted into the right to receive $26.50 in cash, without interest, and a fixed ratio of 1.4286 shares of CenturyLink common stock, with cash paid in lieu of fractional shares.

32.     On October 31, 2016, CenturyLink issued a press release announcing the Merger.

33.     The press release described the transaction as providing the combined company with "the ability to offer CenturyLink's larger enterprise customer base the benefits of Level 3's global footprint with a combined presence in more than 60 countries."

34.     The release also touted the following benefits of the Merger:

● **Enhanced Competitive Offerings in Business Network Services**: The combined company will have significantly improved network capabilities, creating a world-class enterprise player with approximately $19 billion in pro forma business revenue and $13 billion in business strategic revenue, for the trailing twelve months ended June 30, 2016. Together, CenturyLink's and Level 3's revenue will be 76 percent derived from business customers, and 65 percent of the combined company's core revenue will be from strategic services. Given the complementary nature of the portfolios, the combined company will offer an even broader range of services and solutions to meet customers' demand for more bandwidth and new applications in an increasingly complex operating environment.

● **Strong Financial Profile**: The combined company is expected to have improved adjusted EBITDA margins, revenue growth and pro forma net leverage of less than 3.7x at close, including run-rate synergies. The combined company will benefit from Level 3's nearly $10 billion of net operating losses ("NOLs"). These NOLs will substantially reduce the combined company's net cash tax expense over the next several years, ***positioning it to generate substantial free cash flow***.

● **Significantly Accretive to Free Cash Flow with Multiple Opportunities for Growth**: CenturyLink expects the transaction to be accretive to free cash flow in the first full year following the close of the transaction and significantly accretive on an annual run-rate basis thereafter. Furthermore, the transaction will be accretive to CenturyLink's existing growth profile with additional upside opportunities, including the ability to deploy CenturyLink's and Level 3's product portfolio across the combined customer bases. With increased network scale, and dense local metro areas and global reach, the combined company will be positioned to further expand internationally.

● **Substantial Run-Rate Synergies**: Both companies have a proven ability to integrate and meet or exceed synergy targets. The increased scale afforded by the combined company is expected to generate $975 million of annual run-rate cash synergies, primarily from the elimination of duplicative functions, systems consolidation, and increased operational and capital efficiencies.

35.     The press release noted that the combined company "will maintain a significant presence in Colorado and the Denver metropolitan area."

36.     Defendant Post, CenturyLink's CEO, was quoted in the release as stating that "CenturyLink shareholders will benefit from the significant synergies and financial flexibility provided by the combined company's revenue growth and ***strong cash flow***." Defendant Storey was quoted as saying: "***This is a compelling transaction for our customers, shareholders and employees***.  In addition to the substantial value delivered to shareholders, ***the combined company will be uniquely positioned to meet the evolving and global needs of enterprise customers***."

37.     Maintaining "strong cash flow" at CenturyLink was critical to shareholders

because CenturyLink has a very large dividend (currently yielding over 11%, much higher than most companies), and a significant number of its shareholders are attracted to the Company's stock due to the high dividend.  The high dividend yield was also noted as a benefit to Level 3 shareholders who were asked to vote to approve the Merger.  Thus, any events, risks, or uncertainties concerning CenturyLink's ability to maintain its high dividend were of particular importance to the stock market and shareholders.

38.     The most important factor necessary to support CenturyLink's continuing dividend is the Company's free cash flow figure.  For that reason, both analysts and the Company's CEO, Defendant Post, frequently focused on the Company's free cash flows and any factors that affect the free cash flows, which include not only revenues from operations but also, on the negative side, capital expenditures.

39.     The Merger was conditioned on the approval of both companies' shareholders and various other conditions.  The special meeting of Level 3 stockholders to approve the Merger was held at Level 3's headquarters, located at 1025 Eldorado Boulevard, Broomfield, Colorado 80021, on March 16, 2017.

40.     The Prospectus stated that "[u]pon completion of the combination, R. Stewart Ewing, Jr., CenturyLink's current Executive Vice President, Chief Financial Officer and Assistant Secretary, plans to retire. Following Mr. Ewing's retirement, Mr. Sunit Patel, Executive Vice President and Chief Financial Officer of Level 3, will serve as Chief Financial Officer of the combined company."

41.     The Prospectus also stated that "CenturyLink expects Jeff K. Storey, Level 3's president and chief executive officer and Steven T. Clontz, senior executive vice president of Singapore Technologies Telemedia Pte. Ltd., to join the CenturyLink Board upon completion of the combination, with Mr. Clontz serving as the designee of STT Crossing."

42.     The Merger was eventually approved and CenturyLink delivered, on or about November 1, 2017,  an aggregate of approximately $9.6 billion in cash to Level 3's stockholders and, as well, approximately 517.3 million shares of CenturyLink Common Stock valued at approximately $9.8 billion.  As noted by the Prospectus, "The exchange ratio is fixed and will not be adjusted to reflect stock price changes prior to closing of the combination."

43.     But before the Merger closed, and in order to solicit approval for the Merger and to register the 517.3 million new CenturyLink shares to be issued to Level 3 stockholders in the Merger, CenturyLink and Level 3 filed a Joint Proxy Statement and S-4 Registration Statement with the U.S. Securities and Exchange Commission on December 15, 2016.  After filing amendments to the Registration Statement on January 17, 2017, January 27, 2017, and February 9, 2017, the Registration Statement was declared effective on February 13, 2017.  On February 13, 2017, CenturyLink filed a prospectus for the stock to be issued in the Merger on Form 424B3, which incorporated and formed a part of the Registration Statement (the "Prospectus"). The Registration Statement and Prospectus are collectively referred to herein as the Offering

Documents.

44.     Because the exchange ratio was fixed, Level 3 shareholders paid $28.00 per share for each CenturyLink share they acquired in the Merger.  CenturyLink explained the details of the Merger consideration in the following slide that was used when the Company announced the Merger:

<u>CenturyLink to acquire Level 3 for $66.50 per share</u>

- 60% stock consideration at $40.00 per share
- Fixed exchange ratio of 1.4286x ***based on CenturyLink $28.00 per share reference price***
- 40% cash consideration at $26.50 per share

45.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

46.     The Offering Documents were false and misleading because they contained material omissions.  Among other things, the Offering Documents failed to disclose the following material, adverse facts, events, and trends:

- CenturyLink's strategic revenues, including high-bandwith revenues for enterprise customers, had been coming in slower than expected, and were not sufficient to support the aggressive guidance the Company had provided for growth in strategic revenues in 2017

- CenturyLink was losing customers at a faster rate than disclosed for those customers using the Company's service at speeds of 20 MBs or below, as such customers were switching to other carriers who offered higher speeds

- Contrary to the Company's public statements, the churn rate for CenturyLink's consumer customers had increased, not stabilized

- CenturyLink was charging customers for lines and services they did not request or authorize

- Due to increased churn in its consumer customers, and complaints by such customers concerning various issues, including hidden fees, CenturyLink had moved in February 2017 to an allegedly more simplified pricing plan which would have negative effects on revenue and profits in 2017

● CenturyLink's CPE revenue[1] was declining

●Significant uncertainty was being caused by the elongated merger process, resulting in disruption in the sales force and lower revenues.

● After announcement of the Merger, customers were deferring purchases from both Level 3 and CenturyLink because they did not want to make purchases without knowing which network they were going to be on

● CenturyLink was incurring higher CapEx expenditures than forecast, which would negatively impact free cash flow, revenues and profits in 2017 and 2018. The Offering Documents failed to disclose that CenturyLink *had already decided* it would need to accelerate capital expenditures due to increased competition from cable companies, which were aggressively pursuing consumers by offering much faster service (*e.g.*, 1 Gigabyte) at very attractive prices, resulting in consumers switching from CenturyLink to the cable company competitors, and that in order to address this faster service from cable providers, CenturyLink needed to accelerate capital spending to increase the speeds of its networks, many of which continued to offer service of speeds as slow as 40 Mbs or slower.

47.     Defendants were required to disclose this material information in the Registration Statement for at least two independent reasons.  First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the Merger had caused or were reasonably likely to materially impact CenturyLink's future operating results and prospects.  The undisclosed facts alleged herein were likely to (and in fact did) materially and adversely affect CenturyLink's results and prospects and rendered the foregoing representations in the Registration Statement misleading and not indicative of CenturyLink's future operating results and prospects.

48.     Second, SEC Regulation S K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk.

49.      The Registration Statement's discussion of risk factors did not even mention, much less adequately describe, the risk posed by undisclosed facts alleged herein.  For example, the Registration Statement and Prospectus did not disclose the then already realized (and worsening day-by-day) deferral of orders by customers who did not want to make the purchases in light of the uncertainly of which network they would be on, as well as the employee attrition

---

1 CPE is an acronym for "customer-premises equipment."  CPD devices are telecommunications hardware located at the home or business of a customer. Such equipment might include cable or satellite television set-top boxes, digital subscriber lines (DSL) or other broadband Internet routers, VoIP base stations, telephone handsets or other customized hardware used by the telecommunications service provider.

in CenturyLink's sales force which had resulted in loss of sales and revenues and which was expected to result in further reduced revenues in 2017 and the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

50.     The Offering Documents also did not disclose the barrage of complaints from its customers and own employees indicating that CenturyLink was charging customers for lines and services they did not request or authorize and charging customers hidden fees, thus indicating that a material amount of CenturyLink's reported revenues and earnings had been realized by improper conduct, and thus that CenturyLink's revenues would decrease when customers switched to a different carrier or forced CenturyLink to cancel services that had not been authorized.

51.     Moreover, the risk factors that the Offering Documents did discuss were false and misleading because they were generic and vague, and only warned that future events *might occur*, despite the fact that the same type of risks *had already occurred*. For example, the Prospectus stated:

> The pendency of the combination *could* adversely affect the business and operations of CenturyLink and Level 3.
>
> In connection with the pending combination, some customers or vendors of each of CenturyLink and Level 3 *may delay or defer decisions* or reduce their level of business with either or both of the companies, any of which could negatively affect the revenues, earnings, cash flows and expenses of CenturyLink and Level 3, regardless of whether the combination is completed. Similarly, current and prospective employees of CenturyLink and Level 3 may experience uncertainty about their future roles with the combined company following the combination, which *may materially adversely affect* the ability of each of CenturyLink and Level 3 to attract and retain key management, sales, marketing, operational and technical personnel during the pendency of the combination.

52.     This statement was false and misleading because, at the time the Prospectus was declared effective on Feb. 13, 2017 (four and a half months after the Merger was announced), the uncertainty caused by the announcement of the Merger, as well as the elongated time period which had been scheduled for the Merger to close, *had already caused a significant amount of customers to defer purchases from CenturyLink and Level 3*, thus reducing revenues and profits. The announcement had also *already caused significant disruption in the sales force* of both CenturyLink and Level 3.

53.     The Prospectus' boilerplate risk disclosure about potential competition and the potential to need to invest greater resources in order to address such hypothetical increased competition was also false and misleading. That disclosure merely stated:

> *Competition could adversely affect CenturyLink* following the combination in several ways, including (i) the loss of customers and market share, (ii) the possibility of

customers terminating or reducing their usage of the combined company's services or shifting to less profitable services, (iii) reduced traffic on the combined company's networks, (iv) *the combined company's need to expend substantial time or money on new capital improvement projects*, (v) the combined company's need to lower prices or increase marketing expenses to remain competitive, and (vi) the combined company's inability to diversify by successfully offering new products or services.

54.     Another risk disclosure, labeled "CenturyLink Could Be Harmed by Rapid Changes in Technology," stated:

> To enhance the competitiveness of certain of CenturyLink's services, CenturyLink ***may be required to expend additional capital*** to augment the capabilities of its copper-based services or to install more fiber optic cable.

55.     These boilerplate risk disclosures were false and misleading because, at the time the Prospectus was filed, CenturyLink ***was already*** facing significantly increased competition from cable providers and ***had already decided it would need to increase its capital spending it the first half of 2017 beyond forecasted amounts***, well before the merger closed, in order to address this increased competition from cable providers, which were aggressively pursuing consumers by offering much faster service (*e.g.*, 1 Gigabyte) at very attractive prices, resulting in consumers switching from CenturyLink to the cable company competitors, and that in order to address this faster service from cable providers, CenturyLink needed to accelerate capital spending to increase the speeds of its networks, many of which continued to offer service of speeds as slow as 40 Mbs or slower.

56.     CenturyLink's undisclosed decision to increase capital expenditures was directly relevant and highly material to Level 3 shareholders because capital expenditures decrease free cash flow, a key measure of a company's profitability.  Indeed, CenturyLink itself defined free cash flow as "Cash flow from operations minus capital expenditures."

57.     CenturyLink had an unusually long timeline to close the Merger, with the Company projecting that the Merger would be consummated in the third quarter of 2017, nearly a year after it was first announced.  The Company and its representatives reassured shareholders that the time was being used to ensure a successful integration and transition into the combined company, and that integration efforts were being successfully accomplished.  In reality, however, the uncertainty caused by the Merger was causing customers to defer orders, and this material facts was omitted from the Offering Documents.

58.     In addition to omitting to disclose a number of material facts, the Offering Documents also contained affirmative misrepresentations.

59.     For example, the Offering Documents contained the following financial forecasts for CenturyLink, which had been provided to  Level 3 in connection with the due diligence review of CenturyLink conducted by Level 3, and to Level 3's financial advisors, in connection

with their evaluation of the fairness of the merger consideration:

|  | 2017(E) | 2018(E) | 2019(E) | 2020(E) | 2021(E) |
|---|---|---|---|---|---|
|  |  |  | (In millions) |  |  |
| Revenue | $17,612 | $17,913 | $18,494 | $19,227 | $20,078 |
| EBITDA[1] | $ 6,500 | $ 6,450 | $ 6,550 | $ 6,700 | $ 6,900 |
| Capital Expenditures | $ 3,100 | $ 2,900 | $ 2,900 | $ 2,600 | $ 2,600 |

60.     These financial forecasts were false and misleading due to Defendants' failure to disclose the other material information alleged herein, the non-disclosure of which rendered the financial results and forecasts contained in the Offering Documents misleading.   When CenturyLink later disclosed its stand-alone financial results for 2017, the results were much worse.   The following tables provide CenturyLink 2017 results on a standalone unaudited basis and exclude special items (including integration-related expenses), intercompany eliminations and acquisition accounting adjustments associated with the acquisition of Level 3 effective Nov. 1, 2017 (*i.e.*, the results would have been far worse had these costs been included).

| ($ in millions) | Fourth Quarter 2017 | Fourth Quarter 2016 | Full Year 2017 | Full Year 2016 |
|---|---|---|---|---|
| Strategic Revenue[3, 4] | $   1,905 | 2,028 | 7,725 | 8,098 |
| Legacy Revenue[3, 4] | 1,633 | 1,834 | 6,868 | 7,624 |
| Core Revenue[3] | 3,538 | 3,862 | 14,593 | 15,722 |
| Data Integration Revenue | 113 | 131 | 498 | 533 |
| Other Revenue | 313 | 296 | 1,206 | 1,215 |
| Total Operating Revenue | $   3,964 | 4,289 | 16,297 | 17,470 |
| Adjusted EBITDA[2] | 1,471 | 1,585 | 5,842 | 6,513 |
| Adjusted EBITDA[2] Margin | 37.1   % | 37.0   % | 35.8   % | 37.3   % |
|  |  |  |  | 2,958 |
| Capital Expenditures [5] | 528 | 963 | 2,886 |  |

61.     The Offering Documents also contained false and misleading statements regarding CenturyLink's expected future performance.   On February 9, 2017, CenturyLink filed a Form 425 with the SEC.   Form 425s are supplements to prospectuses, and thus form part of the Prospectus.   CenturyLink filed the Form 425 to provide Level 3 shareholders with additional information relevant to the Offering Documents for the Merger.   In the Form 425, CenturyLink attached a copy of the transcript from the conference call the day before (February 8, 2017) to discuss CenturyLink's Q4 2016 and full year 2016 financial results.   In the transcript, Defendant Post said:

"*I am not satisfied with the 2016 results and we are laser focused on improving our trends going forward*. Stewart will discuss with the details a little later, but there are a few things I would highlight about our 2016 results. For the year, total revenues were below expectations due to a slower growth in our strategic revenues than we anticipated coming into 2016. This underperformance was primarily due to a slowdown in the rate of — growth in business, high-bandwidth data services reflecting lower-than-expected new sales MPLS and Ethernet services compared with our original expectations."

62.     Defendant Post also said the following on the call:

Moving to the second initiative. We believe the greatest potential for us to drive returns on our capital investment lies in enabling and delivering broadband services. Obviously, the biggest thing we did in 2016 on this front was the Level 3 acquisition.

63.     Due to significant costs associated with the Level 3 acquisition, CenturyLink was forced to reduce its forecasted CapEx (capital expenditures) for 2017.  Analysts were concerned about this, because capital expenditures drive future revenues, and analysts were concerned that CenturyLink's reduced CapEx forecast would result in lower revenues.  Defendant Post firmly refuted this concern:

Also in the capital side, you will notice that we have reduced our expected 2017 capital spend to $2.6 billion. I want to say a word about that. First, I want to point out that *we don't believe this reduction will materially affect our revenue trajectory in 2017 or 2018*.

64.     With respect to ongoing efforts to integrate Level 3, Post stated:

*In regards to the acquisition of Level 3, we're making progress in the approval integration process* and we have completed all state and federal filings, and we expect to complete the necessary international filings within the next few weeks. *Additionally, we have formed the Integration Managed Office to coordinate and drive the integration planning process on these integration implementation once closing occurs. We believe this combination will create significant benefits and growth opportunities* for all our stakeholders, including our customers, our employees and our shareholders.

First, this transaction will enable us to build a scale — to build scale and deliver agile network-based products and services to customers. We really will be creating a new chapter with this combined company. We also believe *this combination with Level 3 will significantly improve CenturyLink's growth profile, better position to combine company to improve its revenue trend and growth*.

We expect it to drive meaningful operational — operating cash flow growth in the

- 15 -

first full year postclosing, including synergies as realized and including integration cost. ***We expect to drive more than 10% growth in free cash flow per share in the first full year postclosing***, including synergies as realized and, again, including integration costs. And we expect to drive significant improvement in free cash flow per share in subsequent years. Now the transaction ultimately will accelerate recognition of Level 3 net operating losses, which will reduce combined company's net cash tax expense, positioning us to create enhanced free cash flow and significantly lowering CenturyLink's dividend payout ratio. We expect to be able to utilize the combined company's strong product portfolios to bring to the market even more compelling solutions to the combined companies customer base. We continue to expect to receive all the necessary approvals on a timely manner and close the acquisition, we believe, by the end of September 2017.

65.     Moreover, on the February 8, 2017 conference call with analysts (the transcript of which was filed with the SEC on Form 425 as a supplement to the Prospectus), despite CenturyLink's disappointing 2016 results, Defendant Ewing provided the following aggressive financial forecasts for 2017, even though CenturyLink did not typically provide its forecasts to analysts:

For full year 2017, we expect operating revenues of $17.05 billion to $17.3 billion; core revenues of $15.25 billion to $15.5 billion; and operating cash flow between $6.15 billion to $6.35 billion. Adjusted diluted EPS is expected to range from $2.10 to $2.30 per share. We expect free cash flow of $1.55 billion to $1.75 billion, including capital expenditures of approximately $2.6 billion. We anticipate lower operating revenues and core revenues in full year 2017 compared to 2016 due to the expected legacy revenue declines more than offsetting anticipated increases and strategic revenue growth.

66.     Analysts were surprised by CenturyLink's aggressive 2017 forecasts, which indicated that CenturyLink would be able to effectuate a complete "U-turn" in its downward-trending results, as indicated by the following question from an analyst during the call:

**David William Barden**

BofA Merrill Lynch, Research Division

A couple, if I could. The first one would be on the guidance. Stewart, if I multiply the midpoint of your revenue and your EBITDA guidance by 4, you get below the low end of the full year guidance for revenue and operating cash flow, which would imply that you're guiding to revenues U-turning and EBITDA U-turning in the following quarters, which would be a pretty big milestone for CenturyLink looking at the kind of historical trending data. So if you could kind of elaborate a little bit on that, that would be super helpful. And then the second question would be on the CapEx. I think you said that there was some element of the pending

Level 3 merger that was in the lower CapEx number. Obviously, there's some CapEx synergies that are baked into the hypothetical merger model. I'm wondering are we pulling those forward into the current guidance? Or is the money you're not spending now in addition to the money that you might incrementally not spend with the Level 3 deal? And then my last one, if I could, just real quick, is when you're kind of thinking when the Level 3 vote will get scheduled?

67.     In response to this question, Defendant Ewing stated:

**R. Stewart Ewing**

Chief Financial Officer, Executive Vice President and Assistant Secretary

Q:  ***David, on the guidance, you're correct. We believe that basically, we will be able to improve throughout the year*** in terms of the revenue from the standpoint, especially in the latter half of the year. The consumer business, basically, we're working very diligently on penetrating the customers that we've built to from the standpoint of increasing the seats available to them. ***We're working on reducing our churn rate, so we have mitigation programs in place that, based on the trends we've seen over the last couple of quarters, we think we're going to be able to show an improvement from a customer standpoint***. Dean, you want to talk about enterprise for just a minute?

**Dean J. Douglas**
President of Sales and Marketing

A:  Sure. I mean, ***enterprise side, we believe that we'll continue to see a nice ramp up of our revenues associated with the Enterprise business*** for 3 reasons. First reason is that when we look at our backlog, our book backlog, we see an improvement, 40% improvement in our book business going forward from the first part of 2016 through the first part of 2017. The second piece is that we are replacing our Ethernet products. We had 4 Ethernet products in the marketplace that are now being replaced by a single Ethernet product. It's available in all 35 of our markets. It's MEF 2.0 compliant, so it's a current product, consistent with what we're seeing in the marketplace with our competitors. And the third piece is that ***we continue to enjoy a nice performance improvement in our MPLS business combined with our SD-WAN business***, which is going through a number of talks with our customers, and we believe that those talks will become real revenue-generating business opportunities in the second half of 2017.

68.     During the Feb. 8, 2017 conference call, analysts also wanted to know the status of the churn rate of CenturyLink's customers.   In 2016, CenturyLink had experienced a significant level of customer churn.   In response to this question, CenturyLink represented that

churn had decreased:

> **Simon William Flannery**
> Morgan Stanley, Research Division
>
> Q: *So customer behavior is pretty stable, industry growth is stable*?
>
> **Dean J. Douglas**
> President of Sales and Marketing
>
> A: *Yes*. We've got the challenges that most of our competitors have in terms of pricing and the like. But ***we are seeing a churn level that's actually reduced year-on-year***. And so we think that not only is the customer acceptance solid, but we're seeing that manifest itself in new product acquisition as well as in our churn numbers.

69.    The Offering Documents also attached the Merger Agreement as Exhibit A to the Registration Statement.  The Merger Agreement contained "Representations and Warranties" made by CenturyLink, which included the following affirmative representations:

> Parent [CenturyLink] and its Subsidiaries have filed each report and definitive proxy statement (together with all amendments thereof and supplements thereto) required to be filed by Parent or any of its Subsidiaries pursuant to the Exchange Act with the SEC since January 1, 2014 (as such documents have since the time of their filing been amended or supplemented, the "Parent SEC Reports"). As of their respective dates, after giving effect to any amendments or supplements thereto filed prior to the date hereof, ***the Parent SEC Reports (i) complied as to form in all material respects with the requirements of the Exchange Act, and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading***.

70.    The Merger Agreement attached as Exhibit A to the Registration Statement also contained the following representation:

> **Section 4.14. Compliance with Law.**
>
> Since January 1, 2014, the operations of the business of Parent and its   Subsidiaries have been conducted in accordance with all applicable laws, regulations, orders and other requirements of all Governmental Entities having jurisdiction over such entity and its assets, properties and operations, except for any of the foregoing that would not, individually or in the aggregate, have a Parent Material Adverse Effect. Since January 1, 2014, none of Parent or its Subsidiaries has received notice of any violation (or any investigation with respect thereto) of any such law, regulation, order or other legal

requirement, and none of Parent or its Subsidiaries is in default with respect to any order, writ, judgment, award, injunction or decree of any national, federal, state or local court or governmental or regulatory authority or arbitrator, domestic or foreign, applicable to any of its assets, properties or operations, except for any of the foregoing that would not, individually or in the aggregate, have a Parent Material Adverse Effect.

Parent and each of its officers are in compliance in all material respects with (i) the applicable provisions of the Sarbanes-Oxley Act and (ii) the applicable listing and corporate governance rules and regulations of the NYSE. Except as permitted by the Exchange Act, including, without limitation, Sections 13(k)(2) and (3), since the enactment of the Sarbanes-Oxley Act, neither Parent nor any of its Affiliates has made, arranged or modified (in any material way) personal loans to any executive officer or director of Parent.

The management of Parent has (i) implemented (x) disclosure controls and procedures to ensure that material information relating to Parent, including its consolidated Subsidiaries, is made known to the management of Parent by others within those entities and (y) a system of internal control over financial reporting sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, and (ii) disclosed, based on its most recent evaluation prior to the date hereof, to Parent's auditors and the audit committee of Parent's Board of Directors (A) any significant deficiencies in the design or operation of internal controls which could adversely affect Parent's ability to record, process, summarize and report financial data and has identified for Parent's auditors any material weaknesses in internal controls and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in Parent's internal controls.

71.     These representations and warranties in the Offering Documents were false and misleading because, at the time the Registration Statement was filed, CenturyLink ***had already been advised*** by a whistleblower that CenturyLink was violating multiple laws by *systematically adding additional lines and services not requested or authorized by its customers and/or charging excessive or unwarranted fees to its customers*. According to a whistleblower lawsuit filed by former employee Heidi Heiser on June 14, 2017, Heiser had advised multiple CenturyLink supervisors of this unlawful conduct well before the Registration Statement was filed, including supervisors Christine Wells, Denise Medina, and Michael Del Campo.

72.     In October of 2016, Heiser alleges CenturyLink held an online question and answer session that allowed Company employees including Ms. Heiser to post questions to an online message board for review by the Company's CEO, Defendant Post. Based on her first-hand observations working for CenturyLink since August of 2015 as a customer service and sales agent, and out of concern that thousands if not millions of Century Link customers were being improperly charged for services they did not order, during the question and answer session

Ms. Heiser posted a question on-line during the October 2016 session asking the CenturyLink CEO why customers were being given multiple accounts and being billed for things they did not ask for.

73.     Thus, Ms. Heiser made the highest levels of management at CenturyLink aware of her concerns. In response to Heiser's whistleblowing activity, however, Ms. Heiser alleged she was suspended or fired two days after the October 2016 question and answer session, and that her complaint was also taken down from the online forum.

74.     Ms. Heiser also alleged that numerous prior complaints to her supervisors were ignored and/or met with a response that she should just stay quiet.

75.     These detailed allegations form a credible basis to infer serious and systematic violations of the law by CenturyLink and a lack of adequate internal controls at the Company, contrary to the representations and warranties in the Offering Documents.

76.     Based on the false and misleading statements in the Offering Documents, and CenturyLink's reassurances during the Feb. 8, 2017 conference call with analysts in which it portrayed 2016's disappointing financial results as an aberration which would experience a "U-turn" in 2017, buttressed by aggressive 2017 financial forecasts provided to analysts during the conference call, Level 3 shareholders voted to approve the Merger at the March 2017 special meeting in Colorado.

**CENTURYLINK'S STOCK DECLINES IN RESPONSE TO REVELATION OF THE TRUTH**

77.     However, soon after the Merger was approved, the falsity of the statements in the Offering Documents began to be incrementally disclosed.

78.     First, on June 14, 2017, one of CenturyLink's former employees filed a whistleblower lawsuit alleging widespread misconduct at Level 3 going back to 2015-2016, including charging customers for lines and services they did not order or approve.

79.     Upon the disclosure of this news in a story published by Bloomberg, CenturyLink's stock declined from $27.31 on June 14, 2017 to $25.72, on June 16, 2017, on extraordinarily high volume of over 43 million shares traded on June 16, 2017.  *See* Rachel Cao, "CenturyLink shares drop 7% after reports of an alleged billing scam," CNBC Market Insider, June 16, 2017.

80.     In the weeks after the whistleblower lawsuit was filed, class-action lawsuits were filed in several western states, including California, Colorado, Oregon and Idaho, contending that

CenturyLink improperly billed customers and then sent those customers to collection agencies. In response to these lawsuits, CenturyLink stock declined to $23.25 by July 11, 2017.

81. On July 12, 2017, the Minnesota Attorney General sued CenturyLink for consumer law violations and deceptive trade practices, alleging that CenturyLink frequently billed customers at higher rates than its sales agents quoted. Flanked by Minnesotans who have filed some of the "hundreds" of complaints about charges they say they didn't agree to, Swanson announced the lawsuit in a press conference, indicating the lawsuit asks a judge to impose civil penalties, order the company to change its sales practices and require that CenturyLink pay restitution to customers who were misled about their purchases.

82. In response to the July 12, 2017 disclosure of the Minnesota Attorney General lawsuit, CenturyLink's stock declined from to $23.38 to $22.50 on heavy trading volume of 14.88 million shares.

83. On August 2, 2017, CenturyLink reported lower than expected earnings for Q2 2017. CenturyLink reported EPS of $0.46, missing the consensus analyst estimates of $0.49.

84. During the conference call with analysts on August 2, 2017 to discuss Q2 2017, which was held after the stock market had closed, David D. Cole, the Company's Chief Accounting Officer, stated:

> "Second quarter operating revenue on a consolidated basis was approximately $4.1 billion, a 7% decrease from second quarter 2016 operating revenues. Core revenue, defined as strategic revenue plus legacy revenue, was $3.66 billion for the second quarter, a decrease of 7.9% from they year-ago period."

85. In his remarks on the conference call, Chief Accounting Officer Cole also stated that free cash flow had also declined, was negative, and had declined primarily due to higher capital expenditures:

> "Adjusted free cash flow . . . was a negative $52 million for the quarter. This adjusted free cash flow for the quarter was lower primarily due to higher capital expenditures, seasonally higher cash interest and approximately $265 million of cash tax payments in the quarter."

86. Cole also stated that CenturyLink's Consumer Segment also reported declining revenues, falling 6.2% from Q2 2016. Further, on the call, Cole stated that CenturyLink was lowering guidance for the remainder of the year:

> "Turning now to our full year expectations. And again, based on the first half 2017 results, and our current expectations for the remainder of the year, *we do anticipate coming in slightly below our full year 2017 revenue and adjusted diluted EPS guidance, primarily driven by higher legacy revenue declines and lower consumer*

*broadband revenue growth than anticipated*.  . . CenturyLink is not providing updated guidance ranges for full year 2017, due to the pending acquisition of Level 3 currently anticipated to be completed by the end of the third quarter of 2017."

87.    Defendant Post also disclosed on the conference call with analysts that CenturyLink had formed a special committee of the Board of Directors to investigate the whistleblower allegation that the Company was overbilling consumers and billing them for services they did not order, and that the Company had hired "the law firm, O'Melveny & Myers, to conduct [an] independent review of these issues."

88.    In response to a question from a Barclays analyst, Defendant Post also disclosed that customers had been delaying orders due to uncertainty caused by announcement of the Merger:

**Amir Rozwadowski, Barclays PLC**

Q: "[I]n terms of overall customer reception, I mean, as we get closer to the close of the transaction, how has the overall customer reception been to the anticipation of the close of the deal?  Meaning, *how should we think about potential customer churn risk*?  And what are you doing to ensure that, that doesn't take place, things along those lines?

**Glen F. Post, CEO**

A:  The only other item I mentioned there is that as we bring these companies together, we are seeing some delays by customers just waiting for companies to come together and see which – what network infrastructure we're going to utilize, any of the changes that the combination these companies might offer, so we're seeing some delays.  They're not really going to other – our competitors right now, but they are delaying their decision like we believe partially [indiscernible] wanting to see the companies come together."

89.    Defendant Post also admitted that CenturyLink had accelerated Capex spending in Q2 2017 in order to try to address increased churn in its Consumer Segment:

**Philip A. Cusick, JP Morgan Chase & Co:**

Q:  *Can you expand on the disappointing broadband growth last quarter*?  Cable was more aggressive.  I'm wondering why you'd expect cable to be any less aggressive forward – going forward?

**Glen F. Post, CEO**

A:  Yes, on the – *on the cable competition, we don't expect them to be any less [aggressive].  What did happen in the second quarter, we had several key markets they rolled out their gig service and came in a very aggressive pricing*.  What we're doing is

coming back with our – what we're seeing success is the Price for Life product, our pricing plan and the higher speeds we've been able to roll out as *we accelerated CapEx into the first half of the year and the second quarter as we just discussed*.

90.     In response to the disappointing Q2 2017 earnings, CenturyLink's stock declined from $23.74 on August 2, 2017 to $22.40 on August 3, 2017, on unusually heavy volume of 23.96 million shares.  Over the next two weeks, as the market absorbed the negative effect of the worse-than-expected earnings and the implications they had for CenturyLink's results going forward, the Company's stock declined much more, falling to $19.16 by August 18, 2017.

91.     On October 12, 2017, the Company's stock closed at $20.35.  As rumors in the market started to circulate that CenturyLink would report disappointing Q3 2017 earnings, the stock began to decline.

92.     On October 30, 2017, news reports announced that, in the ongoing lawsuit against CenturyLink brought by the Minnesota Attorney General, the judge presiding over the case  had signed a court order requiring CenturyLink to disclose all terms of price at the time of the sale. In commenting on the order, Minnesota Attorney General Lori Swanson said:  "I think people need to have fair and accurate prices to be able to shop around for internet and television services, and this order requires the company to make clear and conspicuous disclosures at the time of the sale of what their prices are, what their fees are, any limitations on the deal and how long the deal lasts."  Swanson also stated that Minnesota still seeks restitution and civil penalties from the lawsuit, and that the court order was just an initial court order to stop the practice while the lawsuit continues.

93.     The court order, signed by Anoka County Chief Judge Douglas Meslow, prohibits CenturyLink from making false statements about the prices and terms of its products and from charging more than it quotes, whether it is selling its own services and products or DirecTVs. If the company does misquote a price, it is not allowed to charge a higher amount, according to the court order.  CenturyLink is now required to clearly disclose at the time of the sale:

- The monthly base price.

- Monthly recurring fees on top of the base price.

- Any one-time fees.

- The amount of the first invoice and future invoices.

- The time period for which the quoted prices apply.

- Restrictions on a consumer's ability to receive the quoted price.

94.     In response to this news, CenturyLink stock declined from $18.99 on October 31,

2017 to $16.37 on November 3, 2017.

95.     Then, on November 8, 2017, after the market closed, CenturyLink surprised the market by announcing disappointing Q3 2017 results.

96.     In the conference call to discuss the Q3 2017 results, Defendant Post admitted that CenturyLink had been experiencing significant uncertainty throughout 2017, caused by the elongated merger process, resulting in disruption in the sales force and lower revenues as a result.  In Q3 conference call, Post said "*I've been obviously talking to the sales team the last few months* just to see what's going on out there.  *And one of the things that they refer to is just the uncertainty that's been caused by the elongated process of bringing these 2 companies together*.  And I realize it's somewhat of an excuse, but it's real to these folks and they're uncertain of where they're going to be.  We changed up the specialty in the global enterprise space, we changed up the leadership to the Level 3 leadership and *it caused a lot of unrest within CenturyLink ranks*.  . . *it's been a real factor out there*."

97.     On November 9, 2017, the first day of trading after CenturyLink disclosed its Q3 2017 results (the results were reported November 8, 2017 after the stock market closed), the Company's stock declined to $15.48 on extremely heavy volume of 39,219,510 shares traded. From then until November 27, 2017, as the market absorbed the surprising news, the stock declined to $13.62.

98.     From the time the Registration Statement was declared effective on February 13, 2017, to November 27, 2017, CenturyLink's stock performed miserably, declining by over 44%, while the Dow Jones Industrial Average gained over 16%, as reflected in the following chart:



99.     After the disclosure of CenturyLink's disappointing earnings, analysts slashed the Company's price targets and the Company's stock price *approached a 20-year low*.  *See* John C. Ogg, "Should CenturyLink Shares Really Be at 20-Year Lows?" 24/7 WALL ST., Nov. 9, 2017, which noted:

> ***CenturyLink Inc. (NYSE: CTL) has had a pretty miserable day after earnings. . . With Level 3 under its belt, should CenturyLink shares really be challenging 20-year lows?*** . . . CenturyLink had $0.42 in earnings per share (EPS) and $4.03 billion in revenue in its third quarter. The consensus estimates from Thomson Reuters called for $0.45 in EPS and $4.06 billion in revenue. The third-quarter report last year had EPS of $0.56 and $4.38 billion in revenue.

> ***In terms of guidance, the company anticipates standalone CenturyLink full-year 2017 results to be below its full-year guidance provided earlier in the year***. Specifically, CenturyLink is reiterating standalone Level 3 full-year 2017 outlook for adjusted EBITDA of $2.94 billion to $3.00 billion and free cash flow of $1.10 billion to $1.16 billion. All other Level 3 outlook measures also remain unchanged. The consensus estimates call for $1.94 in EPS and $16.41 billion in revenue for the full year.

100.    On November 9, 2017, Jeffries also issued a negative report on CenturyLink and lowered its price target.  It noted that the disappointing results all came from CenturyLink and that Level 3's earnings had come in within forecasted levels and analyst expectations:

> ***CenturyLink results disappointed and the FY17 outlook lowered again, though Level 3 results were in line.*** While we expect the combination should provide substantial synergies and a lofty tax shield, we are incrementally more cautious on the ability to meet the dividend obligation. Despite deal benefits, softer results and continued secular headwinds keep us on the sidelines; ***we lower our price target to $17.***

101.    Other analysts also lowered their price targets for CenturyLink on November 9, 2017 in response to CenturyLink's worse-than-expected results, as follows:

- Cowen lowered its price target to $18 from $24.

- Deutsche Bank lowered its price target to $16 from $20.

- JPMorgan lowered its price target from $28 to $26.

- SunTrust Robinson Humphrey lowered its target to $19 from $25.

- UBS lowered its price target to $22 from $29.

102.    CenturyLink's disappointing results continued.   On February 14, 2018, CenturyLink reported its Q4 2017 and full year 2017 financial results.  CenturyLink reported EPS for Q4 2017 of just $0.18, significantly missing consensus analyst estimates of $0.33 (representing a negative downward departure from estimates of 45.45%).

103.    On the conference call with analysts to discuss the results, Defendant Patel, the

Company's CFO, stated that "Total operating revenue in the fourth quarter declined 7.6% to $3.964 billion primarily due to a decline in legacy revenue and the Colocation sale in May of 2017.  Core revenues declined 8.4%, and strategic revenues declined 6.1% in the fourth quarter."

104.    Defendant Patel also stated that "***consumer revenue decreased 5.6%.  Consumer strategic revenue was essentially flat.  We saw a net loss of about 90,000 broadband subscribers this quarter, which were made up of losses of about 140,000 at speeds under 20 meg and gains of approximately 50,000 in higher-speed offerings***."   Defendant Post admitted on the call that "***Our major loss is on broadband and where we have below 20 megabits of spectrum available*** – speed available."

105.    The decline in consumer revenue was highly material to CenturyLink because CenturyLink's consumer business represents roughly 25% of the Company's revenues.

106.    With respect to Capital Expenditures, Defendant Patel stated that "***Full year 2017 capital expenditures were $2.886 billion, which were a bit higher than we expected***."  While this figure was ostensibly slightly lower than estimates, it was in reality higher, as Patel admitted, because excluded from the $2.886 billion in Capex expenses a significant amount of what it called "integration-related expenses" from the Capex figure.  Thus, CenturyLink's actual Capex expenses were higher than the reported $2.886 figure.

107.    On February 15, 2018, Zacks Equity Research published a report entitled "CenturyLink (CTL) Q4 Earnings and  Revenues Miss Estimates," in which it stated:

> CenturyLink Inc. (CTL - Free Report) reported disappointing financial results in the fourth quarter of 2017, wherein both the top and bottom line missed the Zacks Consensus Estimate. Notably, CenturyLink completed the acquisition of Level 3 Communications Inc. in November 2017.
>
> **Net Income**
> CenturyLink's net income in fourth-quarter 2017 was $1,117 million or $1.26 per share, compared with $42 million or 8 cents in the year-ago quarter. However, ***adjusted earnings per share of 18 cents lagged the Zacks Consensus Estimate of 22 cents***.
>
> **Revenues**
> Total revenues in fourth-quarter 2017 were $5,323 million compared with $4,289 million in the prior-year quarter. ***Revenues also missed the Zacks Consensus Estimate of $5,687 million***.
>
> **Operating Metrics**
> Quarterly operating expenses totaled $4,799 million, decreasing 24% year over year. Operating income increased to $524 million from $405 million in the prior-year quarter.  Operating income margin was 9.8% compared with 9.4% in the

year-ago quarter. Adjusted EBITDA decreased to $2,211 million from $2,235 million in the year-ago quarter. Adjusted EBITDA margin was 36.8% compared with 36.6% in the year-ago quarter.

**Cash Flow**

In 2017, CenturyLink generated $3,877 million of net cash from operations compared with $4,608 million in 2016. ***In 2017, free cash flow was $771 million compared with $1,627 million in 2016***.

108.    On February 14, 2018, the day CenturyLink reported its results, the Company's stock closed at $17.58.  By March 23, 2018, the Company's stock price had declined to $15.52. As of the filing of this complaint, the Company's stock was trading at approximately $17.75, a 36.6% decline from the $28.00 per share that Level 3 shareholders paid for their CenturyLink stock which was issued in the Merger pursuant to the Registration Statement and Prospectus.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the 1933 Act Against All Defendants

109.    Plaintiff repeats and realleges each preceding paragraph by reference.

110.    This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

111.    This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

112.    The Registration Statement for the Merger was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

113.    Defendant CenturyLink is the registrant and issuer of the Stock sold in the Merger.  As issuer of the Stock, CenturyLink is strictly liable to plaintiff and the Class for the misstatements and omissions in the Registration Statement.

114.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

115.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

116.    By reason of the conduct alleged herein, each defendant violated, and/or

controlled a person who violated, §11 of the 1933 Act.

117.    Plaintiff acquired CenturyLink stock pursuant and traceable to the Registration Statement for the Merger.

118.    Plaintiff and the Class have sustained damages. The value of CenturyLink stock has declined substantially subsequent to and due to defendants' violations.

119.    At the time of their purchases and acquisitions of CenturyLink stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

120.    By virtue of the foregoing, plaintiff and the other members of the Class are entitled to damages under §11 from the Individual Defendants, and each of them, jointly and severally.

## SECOND CAUSE OF ACTION

### For Violation of §12(a)(2) of the 1933 Act Against All Defendants

121.    Plaintiff repeats and realleges each preceding paragraph by reference.

122.    This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all defendants.

123.    This Count does not sound in fraud. Plaintiff does not allege that the Individual Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

124.    By means of the defective Prospectus, defendants promoted and sold CenturyLink stock to plaintiff and other members of the Class for the benefit of themselves and their associates.

125.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and other members of the Class who purchased or acquired CenturyLink stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

126.     Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff and other Class members acquired CenturyLink stock.

127.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased or acquired CenturyLink stock pursuant to the Prospectus sustained substantial damages.  Accordingly, plaintiff and the other members of the Class who hold the CenturyLink stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their stock, and hereby tender their stock to the defendants sued herein. Class members who have sold their stock seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of §15 of the 1933 Act Against All Defendants

128.     Plaintiff repeats and realleges each preceding paragraph by reference.

129.     This Count is brought pursuant to §15 of the 1933 Act against CenturyLink and the Individual Defendants.

130.     The Individual Defendants each were control persons of CenturyLink by virtue of their positions as directors, senior officers and/or authorized representatives of CenturyLink. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/ or major shareholders of CenturyLink and/or Level 3.  The Company controlled the Individual Defendants and all of its employees.

131.     Defendants each were culpable participants in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the issuance of CenturyLink stock in the Merger to be successfully completed.

132.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the 1933 Act.  As a direct and proximate result of said wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of CenturyLink stock.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Declaring this action to be a proper class action and certifying plaintiff as Class representative under Colorado Rule of Civil Procedure 23;

B.      Awarding compensatory damages in favor of the plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  June 12, 2018                    Respectfully Submitted,

*Pursuant to Rule 121, Sec. 1-26(7), C.R.P.C., a printed or printable copy of this document, with original, electronic, or scanned signature, will be maintained by the Plaintiff and will be made available for inspection by the other parties upon request.*

By: *s/ Rusty E. Glenn*
Rusty E. Glenn (#39183)
THE SHUMAN LAW FIRM
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003

- 30 -

Facsimile: (303) 536-7849
Email:  rusty@shumanlawfirm.com

Kip B. Shuman (#23593)
THE SHUMAN LAW FIRM
Post-Montgomery Ctr.
One Montgomery Street, Ste. 1800
San Francisco, CA 94104
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: kip@shumanlawfirm.com

*-and-*

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Counsel for Plaintiff*